**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 17-20354-CR-COOKE/Goodman**

**UNITED STATES OF AMERICA**

**v.**

**GERALD SLOANE WALLACE**

**Defendant.**

_____/

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM**

COMES NOW, the United States of America, by and through its undersigned counsel, and files this Sentencing Memorandum in support of a twelve-month sentence of incarceration for the defendant followed by a three-year period of supervised release.

**I.       Factual and Procedural History**

On June 15, 2017, a federal grand jury returned a two-count Superseding Indictment against the defendant, Gerald Sloane Wallace, charging him with one count of obstruction of persons in the free exercise of religious beliefs by threat of force with a dangerous weapon in violation of 18 U.S.C. § 247(a)(2) and (d)(3), and one count of knowingly transmitting a threat in interstate communications in violation of 18 U.S.C. § 875(c).

Fueled by his hatred of Islam, on February 19, 2017, the defendant searched for the telephone number of a local mosque. He found the Islamic Center of Greater Miami-Masjid Miami Gardens (also known as Muslim Communities Association of South Florida) (hereinafter "Masjid Miami Gardens" or "the mosque") and dialed it. When no one answered, he left a voicemail stating:

> Fuck you Muslims, fuck Mohammed, fuck the Koran and fuck Islam. I hate you Muslims, you Muslims are terrible. I hate you people. *I'm gonna go down to your center, I'm gonna shoot all ya'll.* Fuck you, I hate your Allah, I hate your Koran, I

hate everything about Islam. You people are worthless shit. Go to hell. Fuck you (emphasis added).

When the mosque's administrative assistant checked the voicemail the next morning, he immediately called 911 to report the threat, and then secured the mosque by locking himself inside. The Miami Gardens Police Department responded to the mosque. By using the mosque's caller ID function, officers identified the telephone number that had been used to leave the offending voicemail, and determined that number was assigned to the defendant. On February 27, 2017, he was taken into custody by the State of Florida.

On February 27, 2017, investigators with the Federal Bureau of Investigation (FBI) and the Miami Gardens Police Department conducted a voluntary, video-recorded interview with the defendant after he was given a *Miranda* warning and waived those rights. During the interview, the defendant admitted that since September 11, 2001, he has had "absolute hatred" for Muslims, especially Muslims in the United States.  The defendant also told the FBI that on February 19, 2017, he was home alone watching the local news when he saw a report on terrorism and Muslims that made him angry.  The defendant informed the FBI that later that day, he reported for his 3:00 p.m. shift as a security guard at a Winn Dixie store in Miami.

While at work, he began researching local mosques on his smartphone. Using the search engine Bing, he found the Almuhimini Islamic Center in Miami, and called it, intending to leave a message expressing his feelings about Muslims, but no one answered and there was no way for him to leave a message. The defendant continued his search and found the North Miami Islamic Center. He again placed a call, intending to leave a similar message, but there was no answer so again he could not leave a message. The defendant stated that he returned to his search results and found the Masjid Miami Gardens. He then placed a third call. This time, although no one answered, he was able to leave his threat to come down to the mosque and shoot its congregants.

The defendant also informed the FBI that he has engaged in similar activity previously. For example, he stated that a couple of months earlier he had called an Islamic Center in Broward County and a mosque in Hialeah and left similar voicemails describing his views of Muslims. He said that he also emailed a message detailing his hatred of Muslims to a Miami Beach mosque. The defendant said that he calls and emails these mosques because he hates Muslims and has thought about killing them.  He believes that all Muslims must leave the United States, whether voluntarily or by force. He stated that he also has posted about his hate for Muslims on Facebook and YouTube.  In addition, during his interview, the defendant provided an accurate description of the Masjid Miami Gardens' location and building, and admitted that he had studied for and obtained a permit to carry a concealed firearm.

Telephone records for the defendant's number demonstrate that on February 19, 2017, at 8:39:42 p.m., someone dialed the Masjid Miami Gardens from the defendant's phone. The call was successfully completed, and lasted for 71 seconds.  The FBI determined that the call was picked up by a local cell tower, transferred to a switch located in Chicago, and then routed back to a Miami tower near Masjid Miami Gardens, where the call was completed.

Consistent with the defendant's assertions during his interview, the T-Mobile records for his cellular phone also confirmed that at 8:38:48 p.m, on February 19, 2017, a call was made from the defendant's cellular phone to the Almuhimini Islamic Center.  Those records likewise confirmed that at 8:39:17 p.m. on the same night, a call was placed from the defendant's cellular phone to the North Miami Islamic Center.  Neither call, however, was successfully completed.

During the interview with FBI and the Miami Gardens Police Department on February 27, 2017, Wallace signed a consent form permitting the FBI to search his T-Mobile smartphone, a second (prepaid) cellular phone that he possessed, and his laptop computer. The FBI found

3

outgoing calls to the three mosques on his smartphone's call log for February 19, 2017. The FBI also extracted his internet searches and found that he had searched for "Islamic center of miami" in Bing on February 19, 2017, and that he had visited the websites for the North Miami Islamic Center and Masjid Miami Gardens. The defendant's smartphone also indicated that during the preceding month, someone had used it to twice conduct Bing searches for "I hate islam," and visited a website by that name.

The FBI also found eighteen outgoing calls between January 17, 2017 and February 27, 2017, the date of the defendant's arrest and interview, to a number saved in the defendant's smartphone as "KKK."  These calls lasted between 23 seconds and one minute. During his interview, the defendant stated that this was the main contact number for the Ku Klux Klan, and that he had placed numerous calls to it in order to listen to the recorded greeting message because he likes the Ku Klux Klan's anti-Muslim voicemail message.

The FBI's search of the defendant's laptop and phones turned up the following statement, saved on "Notepad":  "I hate Islam. Muhammed is a pedophile and a false prophet. I will urinate and stool the Koran if I do indeed see one.  Death to all Muslims."

On December 12, 2015, the Masjid Miami Gardens received the following email from a sender using the name Gerald S. Wallace and an email address matching the one found on his laptop.  The subject line of the email read, "Fuck Islam! Fuck Mohammed. Death to Islam." The body of the email stated:

> Islam is cancer.  Islam is a disease.  Fuck Mohammad. Fuck the Koran.  I hate all Muslims. Islam is a disgrace to the human race. Mohammad is a pedophile. Mohammad is a false prophet. Fuck Islam.  I will never submit to Islam. . . . I want to kill every Muslims [sic] around the world.  Go back to your piece of shit Muslims [sic] nation. . . . I want all Muslims to die.  Fuck you. Muslims are evil. I want to kill you Muslims.

The mosque promptly reported the email to the police.

The threatening voicemail message left members of the Masjid Miami Gardens congregation in fear over their safety. One mosque official estimated that a couple of people dropped out of the congregation after the threat, while another member stated that some congregants did not come to prayer services on the day the threat was discovered. In response to the threatening voicemail, Masjid Miami Gardens arranged to have a Miami Gardens police officer visibly posted outside the mosque during Sunday school; hired an off-duty officer to provide security; and set up an informal internal security system where one congregant who would otherwise be attending prayer services stood watch outside prayers.  The Miami Gardens Police Department also placed a "watch order" on the mosque, instructing its patrol units to drive by the mosque as frequently as possible.

On October 19, 2017, the defendant pleaded guilty to Count One of the Superseding Indictment, which charged the violation of 18 U.S.C. § 247(a)(2) and (d)(3), after entering into a written plea agreement with the United States. The United States Probation Office for the Southern District of Florida completed a Pre-Sentence Investigation Report (PSR) and calculated the advisory Sentencing Guidelines' range as 12 months to 18 months imprisonment based on a total offense level of 13 and a criminal history category of I.  The parties agreed in the written plea agreement that, at sentencing, both the defendant and the United States will jointly recommend that this Court impose a sentence within the advisory Sentencing Guidelines range.

## II.    Argument

When fashioning an appropriate sentence for a defendant, a court must first consider the applicable Sentencing Guidelines range under 18 U.S.C. § 3553(a)(4).  These guidelines are the "starting point and the initial benchmark" for federal sentencing.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Once a court has determined the appropriate sentencing range, it should then

consider that range in the light of the relevant § 3553(a) factors. *Id*. at 49-50. In this case, the Guidelines' range is 12 to 18 months' imprisonment.

Section 3553 requires the Court to consider the need for the sentence imposed to: 1) reflect the seriousness of the offense; 2) promote respect for the law; 3) provide just punishment for the offense; 4) afford adequate deterrence to criminal conduct; 5) protect the public from further crimes of the defendant; and, 6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. § 3553(a)(2). Section 3553(a) also directs the Court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been convicted of similar conduct. § 3553(a)(1) & (6). Section 3553(a) then requires the Court to impose a sentence sufficient to comply with these purposes.

Here, a consideration of the § 3553 factors demonstrate the appropriateness of a within-Guidelines sentence of incarceration. Moreover, there are no compelling justifications that would support a downward variance. *See Gall*, 552 U.S. at 50 (noting that courts should grant variances only where "the justification is sufficiently compelling").

### 1. The Nature and Circumstances of the Offense and the Seriousness of the Offense Warrant a Within-Guidelines' Sentence of Incarceration.

The seriousness of the defendant's offense, as evidenced by the harm the defendant threatened to cause – and caused – supports a sentence of imprisonment. Here, the defendant threatened an entire congregation with violence and death based on his hatred for its religion. Notably, the defendant's selection of his victims and the specificity of his threat underscored its seriousness. He searched for and selected a local congregation, and, when asked in his voluntary interview about the mosque, he provided an accurate description of the mosque's location and

building. He also threatened personally to go to the mosque and shoot worshipers there – a threat made even more menacing by his admission to the FBI that he had studied for and obtained a permit to carry a concealed firearm.

The defendant's actions also evidenced his deliberation and seriousness. The defendant acknowledged that he was reacting to a news report about terrorism and Muslims that made him angry. However, he did not begin dialing mosques immediately upon viewing this television program. He waited several hours, until he was at work, to begin searching for local mosques online. Nor did he call the Masjid Miami Gardens first. Instead, he tried to leave his hate-filled message at two other local mosques. When no one answered, he continued, undeterred, until he reached one that permitted him to leave his message.  The defendant's threat also built on and escalated his self-described pattern of calling and emailing other South Florida mosques to express his hatred.

Although no one was physically injured, the defendant's threat and hate-filled message nevertheless caused real harm to the Masjid Miami Gardens' congregation and the larger community.  Just as the defendant intended, he obstructed congregants' practice of religion by sowing fear and uncertainty.  Masjid members had to decide whether to come to the mosque despite threats; others stood watch outside prayer services rather than praying to afford those inside an additional sense of security; and resources were diverted to pay for an off-duty officer.

Further, the defendant uttered his shooting threat under circumstances that he knew or should have known would have heightened any reasonable congregant's fear.  Wallace threatened to shoot the Masjid Miami Gardens' congregants a little more than six months after 49 people were shot and killed at the Orlando nightclub Pulse; about one month after Dylann Roof was sentenced to death for shooting and killing nine worshippers in a Charleston, South Carolina church; and

during a period of increasing reports of hate crimes against religious minorities nationally. The media coverage of these events over the preceding months ensured that the defendant would have known his words would have a heightened impact, both in the fear they provoked and in the obstruction of religious practice that resulted.

## 2. The Need To Promote Respect for the Law and the Need To Afford Adequate General Deterrence Support a Guidelines' Sentence of Incarceration.

A within-Guidelines' sentence is also necessary to deter others from committing similar offenses and to promote respect for the law. By imposing a sentence of one year of incarceration in this case, this Court can demonstrate that those who threaten innocent people with violence and death will be held accountable. General deterrence is one of the primary purposes of sentencing. *See United States v. McQueen*, 727 F.3d 1144, 1158 (11th Cir. 2013). Deterrence is a particularly relevant factor here, as those who would commit hate crimes may be more likely to be dissuaded from acting on their hatred when they know that society condemns their acts and is willing to enforce its values through incarceration and the concomitant loss of freedoms.

Furthermore, a Guidelines' sentence will vindicate the rights of the people impacted by the defendant's conduct and will promote respect for the Constitution and laws guaranteeing everyone the free enjoyment and exercise of religious beliefs without fear of violent interference.

## 3. The Defendant's History and Characteristics Weigh in Favor of a Guidelines' Sentence.

The defendant has expressed remorse and accepted responsibility in this case. The applicable Guidelines' range already accounts for his acceptance of responsibility with the two-level reduction applied in the PSR pursuant to USSG § 3E1.1(a). Likewise, his criminal history category takes his lack of a prior criminal history into account. Both factors thus counsel for a within-Guidelines sentence.

### 4. Both the Need To Protect the Public from Further Crimes by the Defendant and To Provide the Defendant with Treatment Demonstrate a Guidelines' Sentence, To Include a Three-Year Period of Supervised Release, Is Appropriate.

The United States believes that a three-year period of supervised release is appropriate in this case and will benefit both the public and the defendant. A more extended period will help protect the public from any further threat from the defendant, and – significantly in a hate crime case, in which a single threat may cause widespread fear and loss of security throughout a community – provide a means for the victimized community to feel more secure going about their daily lives. Additionally, the United States believes that the defendant may benefit from mental health treatment, either while incarcerated or as a condition of supervised release. A three-year period of supervised release will permit such treatment as may be appropriate.

### 5. The Need To Avoid Unwarranted Sentencing Disparities Supports the Imposition of a Guidelines' Sentence.

Finally, in fashioning a sentence, the Court also must consider the "need to avoid unwarranted sentence disparities" among "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). This factor also weighs in favor of a Guidelines' sentence of incarceration because a sentence within the Guidelines' range necessarily complies with § 3553(a)(6). *See Gall*, 552 U.S. at 54; *United States v. Kirschner*, 397 F. App'x 514, 519 (11th Cir. 2010). Additionally, other defendants who have been prosecuted for making similar threats in violation of 18 U.S.C. § 247(a)(2) have also received similar sentences of incarceration in other jurisdictions. *See, e.g.*, *United States v. Schnitzler,* No. 8:16-cr-27-JDW-JSS (M.D. Fla. 2016) (sentencing defendant to one year and one day in prison and three years' supervised release after he called two mosques in Pinellas County, Florida and threatened to firebomb them); *United States v. Corum*, No. CRIM. 01-236, 2003 WL 21373219, at *1 (D. Minn. May 22, 2003) (sentencing defendant to 16 months in prison and three years' supervised release after he left threatening voicemail messages for synagogues).

9

### III.    Conclusion

For the reasons stated, the United States recommends that this Court impose a within-Guidelines' sentence of twelve months in prison and three years' supervised release. Such a sentence will capture the harm to the community perpetrated by the defendant, account for the § 3553 factors, and consider the defendant's situation.

Respectfully submitted,

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY


By:    *s/ Harry C. Wallace, Jr.*
       HARRY C. WALLACE, JR.
       Assistant United States Attorney
       Florida Bar No. 0623946
       United States Attorney's Office
       Southern District of Florida
       99 NE 4th Street
       Miami, FL  33132
       Tel: (305) 961-9401
       harry.wallace@usdoj.gov

JOHN M. GORE
ACTING ASSISTANT ATTORNEY GENERAL


By:    *s/ Samantha Trepel*
       SAMANTHA TREPEL
       Trial Attorney
       Court ID No. A5501689
       Civil Rights Division
       U.S. Department of Justice
       950 Pennsylvania Avenue NW, PHB
       Washington, DC  20530
       Tel: (202) 305-3204
       Fax: (202) 514-8336
       samantha.trepel@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on January 11, 2018, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

counsel of record in this case.

*s/ Harry C. Wallace, Jr.*
HARRY C. WALLACE, JR.
Assistant United States Attorney
